UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JAMES R. DYKES,                          )
                                         )
                  Plaintiff,             )
                                         )
           vs.                           )        No. 1:15-cv-01583-LJM-DKL
                                         )
CAROLYN W. COLVIN Acting                 )
Commissioner of the Social Security      )
Administration,                          )
                                         )
                  Defendant.             )

## ENTRY ON JUDICIAL REVIEW

Plaintiff James R. Dykes ("Dykes") requests judicial review of the final decision of

Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration

(the "Commissioner"), which denied Dykes' applications for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the

Social Security Act, 42 U.S.C. §§ 416, 423 & 1382(c).  Dykes asserts that (1) the ALJ

failed to give proper weight to the opinions of Dykes' treating physicians and (2) the ALJ's

residual functional capacity assessment was improper.  The Commissioner contends that

substantial evidence supports the ALJ's findings and that the ALJ adequately explained

his reasoning for finding that Dykes was not disabled.

## I. BACKGROUND

## A. PROCEDURAL HISTORY

Dykes filed his applications for DIB and SSI on April 19, 2010, alleging that his

disability began on February 1, 2010.  R. at 149, 156.  The claim was denied initially on

July 2, 2010, R. at 65, and upon reconsideration on August 18, 2010.  R. at 80.  Dykes timely requested a hearing before the ALJ on August 26, 2010.  R. at 94-95.

On July 20, 2011, the ALJ held a hearing, at which Dykes, who was represented by counsel, and a vocational expert testified.  R. at 26-60.  On September 23, 2011, the ALJ found that Dykes was not disabled.  R. at 9-25.  The Appeals Council denied Dykes' request for review on February 27, 2012.  R. at 1-4.  On March 23, 2012, Dykes filed a complaint in the United States District Court for the Southern District of Indiana, Cause No. 1:12-cv-00370-MJD-RLY, and the District Court remanded the matter to the Commissioner on January 8, 2013.  R. at 491-513.

The ALJ held hearings on May 2, 2014, and October 7, 2014, R. at 443-490, and issued a decision on January 8, 2015, finding that Dykes was not disabled.  R. at 410-433.  Dykes made a timely request for review for the Appeals Council, and the Appeals Council denied Dykes' request for review on August 4, 2015, rendering the ALJ's decision the final decision of the Commissioner.  R. at 404-406.

On October 7, 2015, Dykes filed the instant appeal pursuant to 42 U.S.C. § 405(g).

## B.  AGE, EDUCATION, WORK HISTORY & DYKES' PERCEPTION OF HIS IMPAIRMENTS

Dykes was forty-four years old at the time of the alleged onset date.  He has a high school education.  Dykes has past relevant work experience as a produce department manager, a hospital foods services dietary cook, and a grill cook.  R. at 188-191, 460-461.  At the hearings on May 2, 2014, and October 7, 2014, Dykes testified that he stopped working because of knee, shoulder, and back pain.  R. at 457-458.  Dykes stated that he has since had surgeries in both of his knees and in his right shoulder that resolved most of the problems he had in those areas.  R. at 458, 476.  He further testified that his

back pain continues to keep him from working.  R. at 458-459.  He indicated that problems with his spine cause him difficulty bending and lifting.  R. at 477.  Dykes had surgery to implant a spinal cord stimulator to manage his back pain and stated that his doctors also recommended he get a pain pump implanted to further relieve his back pain.  R. at 458.  Dykes stated that he is also taking Hydrocodone to manage his back pain.  *Id.*

Dykes testified that can stand for "maybe 20 minutes" before needing to sit down and can walk only two blocks at a time.  R. at 459.  He indicated that he can sit for only thirty minutes at a time and has problems bending and lifting.  R. at 459, 477.  Dykes stated that he often has to elevate his legs as a result of restless leg syndrome.  R. at 477-478.  Dykes further indicated that he can push a grocery cart but cannot pull much of anything for fear of tearing a tendon in his shoulder.  R. at 480.  He also stated that his surgeon advised that he should not lift more than twenty pounds.  R. at 480-481.  Dykes testified that has to lie down and rest for up to six hours during the day.  R. at 485.  He further stated that he spends most of his time in bed because of his physical condition and cannot get out of bed to get dressed three days per week.  R. at 459-460.

Dykes testified that he had two strokes within three days of each other that causes problems with his short term memory and concentration.  R. at 278-279, 482.  He stated that he was hospitalized for over a week after his second stroke, which caused hemorrhaging.  R. at 482-483.  He also stated that he has problems with his speech as a result of his strokes.  R. at 481.  Dykes further indicated that he cannot concentrate on any task for more than two hours at a time.  R. at 460.  He testified that he sometimes gets lost when traveling around his community and that his fiancée tends to manage his affairs.  R. at 480, 485.

In addition to his physical ailments, Dykes testified that he has problems with depression, for which he sought treatment at Meridian Health Services.  R. at 479.  He also stated that he took Cymbalta to treat his depression for a year and then switched to Wellburtrin XL.  R. at 479, 484.  He further indicated that he has problems sleeping and sometimes has suicidal thoughts.  R. at 479-480.

## C.  RELEVANT MEDICAL EVIDENCE

### 1.  Treatment Records

**a.  Physical Treatment Records—**Dykes complained of knee and shoulder pain to Daniel Palmer, M.D. ("Dr. Palmer"), on July 29, 2010.  R. at 1102.  An x-ray of Dykes' lumbar spine ordered by Dr. Palmer and taken on January 19, 2011, also showed that Dykes had mild diffuse degenerative change, which caused him back pain.  R. at 1040.

On February 15, 2011, orthopedist Damion M. Harris, M.D. ("Dr. Harris"), examined Dykes and noted pain with limited range of motion in Dykes' left knee and right shoulder, and full range of motion without difficulty in Dykes' left hip, foot, and ankle.  R. at 952-53.  Dr. Harris further noted that an MRI revealed a nearly torn anterior cruciate ligament in Dykes' left knee and torn supraspinatus, infraspinatus, and bicep tendons in Dykes' right shoulder.  R. at 953.  The torn tendons in Dykes' right shoulder were surgically repaired by Dr. Harris on March 7, 2011.  R. at 322.

Primary care physician Darla Palmer, M.D.,[1] also completed a check-mark form on March 24, 2011, which indicated that Dykes could rarely lift ten pounds; could never

---

[1] While the opinion from March 24, 2011, appears to be signed by "Darla Palmer, M.D.," all other references to a Dr. Palmer in the medical record refer to Daniel Palmer, M.D. Although it is not clear whether these opinions are from the same physician, the distinction between these physicians is inconsequential to this Entry.  Therefore, the opinions put forth by Darla Palmer, M.D., will be treated as an opinion of Dr. Palmer.

lift more than ten pounds; could stand and/or walk for less than one hour per eight-hour workday; could sit for less than two hours per eight-hour workday; had limited use of his upper extremities and of both hands; and could never be exposed to dust, fumes, gas, temperature changes, or humidity.  R. at 362-364.

On May 23, 2011, Dykes was admitted to St. Vincent Hospital for a possible stroke. R. at 366.  However, by the time he arrived at the hospital, his symptoms had "improved drastically," and a neurological exam performed by Michael Sermersheim, M.D. ("Dr. Sermersheim") on Dykes appeared normal.  *Id.*  Dr. Sermersheim started Dykes on an aspirin regimen and indicated that Dykes' prognosis was good.  R. at 367.  Several days later, on May 27, 2011, Dykes returned to St. Vincent Hospital after suffering a subarachnoid hemorrhage.  R. at 373-374.

An MRI of Dykes' back conducted on June 3, 2011, showed that Dykes also had a disc bulge at L5-S1, a disc protrusion at L1-2, and some mild degenerative changes. R. at 359-60.  On June 9, 2011, Dr. Harris noted that Dykes' recovery from shoulder surgery was slowed by his strokes, but that Dykes nonetheless reported improvement in his shoulder pain.  R. at 379.  Dr. Harris further noted that Dykes' shoulder felt much better than it had prior to surgery and measured full strength in Dykes' right shoulder on August 4, 2011.  *Id.*

On October 11, 2011, Dykes reported to Dr. Harris that he was happy with his right shoulder surgery and would like to have surgery on his left knee.  R. at 961.  Dykes underwent left knee replacement surgery on November 2, 2011.  R. at 966, 989.  Six weeks after his knee replacement surgery, Dr. Harris reported that Dykes was doing even better than expected.  R. at 970.

On August 13, 2012, Dr. Palmer took an MRI of Dykes' right knee, which showed a tear in the medial meniscus and mild degenerative changes.  R. at 1072.  Another MRI taken on August 21, 2012, revealed some degenerative changes in Dykes' lumbar spine. R. at 1077.

On September 6, 2012, orthopedic surgeon Ravishankar Vedantam, M.D. ("Dr. Vedantam"), noted that Dykes had degenerative spondylosis, but had no significant signs of lumbar radiculopathy.  R. at 769.  Dr. Vedantam recommended non-surgical treatment and indicated that Dykes had never attended physical therapy for his back pain.  *Id.*  Dr. Vedantam referred Dykes to physical therapy and encouraged him to do low impact, aerobic exercises, such as walking, swimming, and bicycling.  *Id.*  Dr. Vendantam indicated that Dykes could wear a lumbosacral belt when doing physical work and could use a heating pad as needed.  *Id.*

Dr. Sermersheim noted that Dykes reported having severe back pain and recorded weakness in both of Dykes' legs and a positive straight leg raise test during an examination on September 11, 2012.  R. at 1115-1116.  On November 13, 2012, Dr. Sermersheim noted that Dykes had normal short-term recall and alertness, as well as some leg weakness, normal cranial nerve and cerebellar examinations, normal sensation, and a limp.  R. at 779.

Dykes underwent a right knee arthroscopy on December 12, 2012, to resolve pain stemming from a fall that occurred in May or June 2012.  R. at 973, 992.  Two weeks after the procedure, Dykes reported occasional, moderate pain in his right knee but indicated that he was improving.  R. at 974.  On January 22, 2013, Dr. Harris stated that Dykes' right knee was "doing much better than prior to surgery."  R. at 978.

6

An MRI of Dykes' lumbar spine taken on January 24, 2013, revealed mild diffuse thoracolumbar spondylosis.  R. at 1081.  Neurosurgeon Julius A. Silvidi, M.D. ("Dr. Silvidi"), evaluated Dykes on January 31, 2013, and noted that Dykes exhibited no signs of lumbar radiculopathy.  R. at 775.  Dr. Silvidi did not recommend surgery, but did suggest that Dykes might obtain an evaluation for a spinal cord stimulator.  *Id.*

Dykes presented to Dr. Sermersheim on February 5, 2013.  R. at 783.  Dr. Sermersheim noted Dykes' motor and sensory exams appeared normal, but that Dykes had an antalgic gait and walked with a cane.  *Id.*  Dr. Sermersheim also indicated that he thought Dykes was a good candidate for a spinal cord stimulator.  *Id.*

Joshua R. Wellington, M.D. ("Dr. Wellington"), examined Dykes on March 21, 2013, and provided a second opinion regarding whether Dykes was a good candidate for a spinal cord stimulator.  R. at 791-93.  Dr. Wellington found that Dykes experienced pain with palpation in the sacroiliac area but had full muscle strength, normal reflexes, and no sensory deficits.  R. at 792.  Dr. Wellington concluded that Dykes had back pain of unknown etiology and expressed concern that Dykes had not sought out active treatments in the past and appeared to be looking for an easy "fix" for his back pain.  *Id.* Nonetheless, Dr. Wellington agreed that Dykes might benefit from receiving a spinal cord stimulator.  *Id.*

On May 21, 2013, Edward Kowlowitz, M.D. ("Dr. Kowlowitz"), examined Dykes and observed that he had normal muscle strength and tone, as well as normal reflexes.  R. at 803.  Dr. Kowlowitz found limited range of motion in Dykes' lumbosacral spine but noted that Dykes had negative straight leg raise tests.  *Id.*  Dr. Kowlowitz also agreed that Dykes should receive a spinal cord stimulator.  *Id.*

In addition to his shoulder, knee, and back pain, Dykes was also diagnosed with obstructive sleep apnea on March 27, 2013, by Adam J. Fisch, M.D. ("Dr. Fisch").  R. at 1127.  Dr. Fisch recommended that Dykes use a continuous positive airway pressure (CPAP) machine.  *Id.*

Dykes underwent right knee replacement surgery performed by Dr. Harris on July 10, 2013.  R. at 986, 1004.  At a follow-up examination on August 20, 2013, Dykes reported that he was "very happy with his knee" and experienced only occasional, minor discomfort.  R. at 1150.

On July 26, 2013, Dr. Vedantam submitted a "formal health record" based on Dykes' condition, which indicated that Dykes had negative straight leg raise tests, normal motor and sensory exams in his legs, a cautious gait with a right-favoring limp, and normal range of motion in hips and knees.  R. at 772.  On the same day, Dr. Palmer opined that Dykes could sit for two hours at a time and for four hours total during an eight-hour workday; could stand and walk for one hour at a time and two hours total during an eight-hour workday; could occasionally lift and carry up to five pounds but never could never lift or carry more; could use his hands for grasping, pushing and pulling, and fine manipulation; could never squat or crawl but could occasionally bend, climb, reach, stoop, balance, kneel, and crouch; was moderately restricted from unprotected heights; and mildly restricted from driving and from exposure to dust, fumes, and gasses.  R. at 1100.

Dykes received a permanent spinal cord stimulator implant on September 24, 2013.  R. at 1137.  Dykes reported that he was very satisfied with the pain relief he obtained from the spinal cord stimulator on December 3, 2013.  R. at 1144.  Larry T.

Micon, M.D., indicated that Dykes was doing well and had little residual discomfort following the implantation of his spinal cord stimulator.  *Id.*

On January 3, 2014, Dykes reported that the spinal cord stimulator was working well and that his back pain had decreased by 70-80%.  R. at 1178.  Dykes also indicated he was sleeping well and was no longer taking any pain medication.  *Id.*  On January 9, 2014, Dykes informed Dr. Harris that he was experiencing tightness and mild to moderate pain in his right knee, which Dykes described as "a bit of a nuisance."  R. at 1163.

On March 17, 2014, Ryan Minnich, D.O. ("Dr. Minnich"), opined that Dykes was "not capable of performing any sustained work activity."  R. at 1182.  Dr. Minnich stated that Dykes could sit for two hours at a time and four hours total; could stand for one hour at a time; could not walk at all; and could stand and/or walk for three hours total during an eight-hour workday.  R. at 1183.  He further opined that Dykes could occasionally lift five pounds or less but never more than five pounds; could not grasp with his left hand, or push or pull with either hand; could not use either foot for repetitive movements; could occasionally bend and squat; and could never crawl, climb, reach, stoop, balance, kneel, or crouch.  *Id.*  Additionally, Dr. Minnich indicated that Dykes had no restrictions with regard to unprotected heights, exposure to changes in temperature and humidity, or exposure to dust, fumes, and gasses, but that Dykes was mildly restricted with regard to being around machinery and driving an automobile.  *Id.*

Dykes received a steroid injection on May 16, 2014, and a nerve block in his lumbar spine on May 23, 2014, to relieve his back pain, despite having his spinal cord stimulator. R. at 1381, 1387.

Dykes also had right knee arthroscopy surgery on July 25, 2014.  R. at 1371.  At a follow-up examination on August 12, 2014, Dykes reported that he had tenderness but experienced no pain, and that he completed his home exercise program without the use of an assistive device.  *Id.*

**b.  Mental Health Treatment Records—**Dykes began seeing a therapist, Karen Hornsby ("Ms. Hornsby"), at Meridian Health Services on September 4, 2012.  R. at 815. Dykes reported being depressed due to his back pain and his decreased quality of life. *Id.*  On October 9, 2012, Ms. Hornsby diagnosed Dykes with major depression, single episode.  R. at 818.  Dykes reported difficulties due to family issues and physical stress. R. at 820.  On October 27, 2012, Dykes reported feeling a "little better" because he had gotten his own apartment.  R. at 826.  Throughout October and November 2012, Dykes reported concerns about his parents' health and financial stress.  R. at 833-846.  On December 29, 2012, Ms. Hornsby noted that Dykes had been taking two depression medications, but that the two medications did not work effectively when taken together. R. at 857.  Dykes continued to see Ms. Hornsby through March 2013, and continued to report financial difficulties and frustrations related to his medical care.  R. at 858-94.

On February 25, 2013, Amber Whited, Ph.D. ("Dr. Whited"), examined Dykes and indicated that Dykes was friendly, polite, and cooperative, and exhibited good social skills. R. at 787.  Although Dykes reported symptoms of depression, Dr. Whited found that he presented as happy at the examination, without any signs of depression.  *Id.*  Dr. Whited also stated that Dykes had normal speech, eye contact, and impulse control and noted that Dykes was able to follow directions and answer all questions without confusion.  R. at 788.  Dr. Whited administered the Montreal Cognitive Assessment test, and Dykes'

results indicated average intelligence with mild impairments in the areas of auditory attention and language skills.  *Id.*  The test results furthered indicated that Dykes had no impairment in immediate or short-term memory or concentration.  R. at 789.  Dr. Whited concluded that although Dykes reported problems with depression and anxiety, he exhibited no signs of psychiatric impairment that would interfere with the implantation or use of a spinal cord stimulator.  R. at 788.

On June 14, 2013, Ms. Hornsby stated that Dykes was completely independent with personal hygiene and needed only minor assistance with taking care of his household.  R. at 915.  She also indicated that Dykes needed only minor assistance with developing and maintaining appropriate relationships and displaying appropriate behavior.  R. at 916.

On August 28, 2013, Ms. Hornsby indicated that Dykes experienced mild depression.  R. at 1226.  On September 30, 2013, Dykes indicated that his mood was "much improved due to improved functioning relating to pain relief."  R. at 1247.  Dykes continued therapy with Ms. Hornsby throughout the remainder of 2013.  R. at 1198-1277.

On January 15, 2014, social worker Randy Wilson ("Mr. Wilson") observed that Dykes was appropriately dressed and groomed, with normal speech and mood.  R. at 1280.

Hector Diaz, M.D. ("Dr. Diaz"), examined Dykes on February 19, 2014.  R. at 1297, 1305.  Dr. Diaz indicated that Dykes' mood was sad but that he was well groomed, had a normal gait, and was cooperative.  R. at 1298-1299.  Dr. Diaz also assessed that Dykes' memory, insight, and judgment were fair.  R. at 1299.  Dykes reported that Wellbutrin XL

was providing good results after switching from Cymbalta, and Dr. Diaz instructed his to continue using Wellbutrin XL.  R. at 1300.

On March 26, 2014, Mr. Wilson stated that Dykes experienced limited improvement in his depression symptoms and that he continued to struggle with chronic pain and memory issues related to his prior strokes.  R. at 1193.  Mr. Wilson opined that Dykes was markedly limited in his ability to travel to unfamiliar places, moderately limited in his ability to maintain attention and concentration for extended periods and to complete a normal workday and workweek without interruption from symptoms, and not significantly limited in his ability to perform activities within a schedule or to set realistic goals.  R. at 1194-1195.  Mr. Wilson provided no evidence of limitation in any other listed categories. R. at 1195.

Dykes continued to attend therapy throughout 2014.  R. at 1405-1436.   On November 6, 2014, Mr. Wilson diagnosed Dykes with major depression and cannabis dependence and had been in full, sustained remission for four to five years.  R. at 1440.  Mr. Wilson opined that Dykes would need days off "at will" to manage health issues and that Dykes had memory deficits that would persist.  R. at 1440.  In contrast to his opinion from March 26, 2014, Mr. Wilson opined that Dykes was either markedly or moderately limited in every category available, with the exception of maintaining socially appropriate behavior and adhering to standards of neatness and cleanliness.  R. at 1441-1442.

### 2. Social Security Administration Consultative Exams

On June 11, 2010, Abou Mazdai, M.D. ("Dr. Mazdai"), examined Dykes at the request of the state agency.  R. at 280.  Dr. Mazdai observed that Dykes had a normal gait without assistive device and had no difficulty getting on or off the exam table.  *Id.*

Dykes had slightly decreased range of motion in his lumbar spine and his left knee.  R. at 279.  Dr. Mazdai recorded that Dykes had full strength and normal tone in all muscle groups but had difficulty squatting and walking on his heels.  R. at 281.  X-rays revealed mild osteoarthritis in Dykes' left knee, mild degenerative disk disease in Dykes' thoracic and lumbar spine, and moderate disk disease at the L5-S1 vertebra.  R. at 282-283.

State agency physician D. Neal, M.D. ("Dr. Neal"), opined on June 29, 2010, that Dykes could perform work at the medium exertional level but could only occasionally lift fifty pounds or less; stand or walk about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday.  R. at 286-292.  State agency physician J. Sands, M.D., affirmed Dr. Neal's opinion on August 18, 2010.  R. at 293.

Albert Singh, M.D. ("Dr. Singh"), examined Dykes at the request of the state agency on June 7, 2014.  R. at 1323-1326.  Dr. Singh noted that Dykes had no problems getting on or off the exam table or out of his chair, and that he could dress and undress without difficulty.  R. at 1325.  Dr. Singh recorded that Dykes experienced tenderness along his lumbar spine and in his right shoulder.  *Id.*  Dr. Singh reported that Dykes had full grip strength and a normal gait without using an assistive device.  *Id.*  He also indicated that Dykes' straight leg raise tests were negative and that Dykes could walk on his heels and toes.  *Id.*  Dr. Singh measured full strength in Dykes' arms and legs, but decreased sensation to light touch along one side of Dykes' right hand.  *Id.*  Additionally, Dr. Singh recorded some minor limitations in Dykes' range of motion.  R. at 1329.  Dr. Singh concluded that Dykes could continuously lift up to ten pounds; could frequently lift eleven to twenty pounds; could occasionally lift twenty-one to fifty pounds; could sit for three hours at a time and six hours total during an eight-hour workday; and could stand and

walk one hour at a time each and three hours total each during an eight-hour workday. R. at 1330-1331.

Kenneth D. McCoy, Ph.D. ("Dr. McCoy"), consultatively examined Dykes' mental condition at the request of the state agency on June 3, 2014. R. at 1318. However, Dr. McCoy indicated that he could not complete his medical source statement due to suspicions that Dykes was malingering. R. at 1316. Dr. McCoy observed that Dykes was clean, appropriately dressed, and well-groomed. R. at 1319. Dr. McCoy further noted that Dykes' speech was normal, his thought processes were intact, and he had mild difficulty with inattention. *Id.* Dykes reported to Dr. McCoy that he was able to take care of his personal hygiene and did basic cooking, cleaning, laundry, and shopping. R. at 1320. Dr. McCoy's testing indicated that Dykes' immediate and remote memory were intact but that his "overall neuropsychological functioning" was moderately impaired. R. at 1320-1321.

### D.  MENTAL HEALTH CASE MANAGER TESTIMONY

Ms. Hornsby, a behavioral clinician and case manager at Meridian Health Services, testified at the May 2, 2014, hearing. R. at 486-488. Ms. Hornsby testified that she had been working with Dykes for a little more than a year and performed multiple services for him, including daily skills building, aiding in depression management, developing coping skills, and helping with day-to-day activities. R. at 486. Ms. Hornsby indicated that she did not believe Dykes could sustain any form of work on a full-time basis because of his physical restraints and depression. R. at 487. She also stated that she did not believe Dykes could work because he often struggled to get out of bed and to maintain his personal hygiene. *Id.* Ms. Hornsby further testified that she did not believe

Dykes could concentrate for two hours at a time and that Dykes occasionally got lost in his community.  R. at 487-488.

### E.  MEDICAL EXPERT TESTIMONY

Medical expert Dr. Arthur Brovender ("Dr. Brovender") testified at the hearing on May 2, 2014.  R. at 445-457.  Dr. Brovender testified that he reviewed all of the medial evidence within the record.  R. at 467.  He stated that Dykes's medical records demonstrated that Dykes had mild osteoarthristis and degenerative joint disease in his left knee, degenerative disc disease, transitional vertebra, a torn meniscus, a rotator cuff repair in his right shoulder, spondylosis in his low back, osteoarthritis with facets of foraminal narrowing, bilateral pars defects, a herniated disc, and spinal stenosis.  R. at 467-468.  Dr. Brovender opined that Dykes' impairments do not meet or equal any of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d) and 416.926) ("Appendix 1").  R. at 469. He further opined that Dykes could sit for six hours at a time; could stand and walk for six hours at a time; could frequently lift ten pounds and could occasionally lift twenty pounds; could never go on unprotected heights, ropes, ladders, or scaffolds and could never crawl; could frequently bend, stoop, and squat; could occasionally kneel; could occasionally reach overhead with his right shoulder; and could perform fine and gross manipulations without limitation.  R. at 469-470.

Dr. Lee Fischer ("Dr. Fischer") and Dr. James Brooks ("Dr. Brooks") testified at the hearing on October 7, 2014.  R. at 467-474.  Dr. Fischer testified that he also reviewed all of the medical evidence available in the record.  R. at 445.  He stated that Dykes suffered from chronic low back pain, lumbar degenerative disc disease, lumbar

spondylosis, sleep apnea, COPD, and restless leg syndrome, and that Dykes underwent surgeries to replace both of his knees because of chronic knee pain and right rotator cuff surgery because of a rotator cuff impingement.  R. at 446.  He also testified that Dykes' physical impairments did not meet or equate to any of the listed impairments found in Appendix 1.  *Id.*  Dr. Fischer opined that Dykes would be limited to sedentary physical exertional work because of his impairments and that he could occasionally climb stairs; could never climb ladders, ropes, or scaffolds; could occasionally balance or stoop but should never kneel, crouch, or crawl; could occasionally perform manipulative work overhead with his right upper extremity; occasionally use foot controls; and should avoid unprotected heights.  R. at 446-447.  Dr. Fischer also indicated that he did not believe Dykes had any residual physical impairments as a result of his strokes.  R. at 452-453.

Dr. Brooks testified that he reviewed all of the medial evidence within the record and found that Dykes had some history of drug use and had reported some depression and memory problems as a result of his strokes.  R. at 453.  Dr. Brooks stated that the medical evidence demonstrated that Dykes prepared meals and did some chores and shopping.  R. at 454.  He also indicated that Dykes' memory appeared to be intact based on the medical evidence.  *Id.*  Dr. Brooks noted that Dr. McCoy could not complete a residual functional capacity assessment because he believed Dykes might have been malingering, but Dr. Brooks did not find any evidence of malingering in the record.  *Id.* Dr. Brooks stated that Dykes' IQ was normal without any severe cognitive impairment. *Id.*  He also testified that Dykes was diagnosed with a moderate level of depression as well as some generalized anxiety symptoms and had received treatment for his depression from Meridian Health Services.  *Id.*

Based on Dykes' mental health records, Dr. Brooks opined that Dykes' mental impairments did not meet or equate to any of the listed impairments found in Appendix 1. R. at 455-456.  Dr. Brooks further stated that Dykes should be limited to simple, repetitive, and unskilled work but did not believe that Dykes' impairments would further limit his ability to work.  R. at 456.

### F.  VOCATIONAL EXPERT TESTIMONY

Vocational expert, Dewey Franklin ("VE"), testified at the hearing on October 7, 2014.  R. at 460-463.  The VE reviewed Dykes' relevant work history as well as the exertion level and other skill levels associated with them.  R. at 461.  The ALJ asked the VE to opine on the simple and repetitive or unskilled work that existed in the national economy for a hypothetical person with Dykes' age and educational background that could occasionally climb ramps and stairs; could not climb ladders, ropes, or scaffolds; could occasionally work overhead with the right upper extremity and frequently in other orientations; could occasionally use foot controls; and should avoid work from unprotected heights.  *Id.*  The VE testified that such an individual could not perform Dykes' past work but that such an individual could perform other jobs requiring sedentary, unskilled work.  *Id.*  The VE stated that an individual meeting these standards could be a Circuit Board Assembler, with over 400 available jobs in Indiana and over 13,000 available jobs nationally; an Information Clerk, with over 1,000 available jobs in Indiana and over 80,000 available jobs nationally; or a Surveillance Systems Monitor, with over 200 available jobs in Indiana and over 16,000 available jobs nationally.  R. at 462.  When the ALJ asked the VE to consider the same hypothetical person but added that this person

would also be unable to work three times a week due to symptoms, the VE stated that this limitation would preclude competitive employment.  *Id.*

In response to questions from Dykes' counsel, the VE further opined that a person of Dykes' age, education, and experience that could stand for ten minutes, could walk about two blocks, could sit for thirty minutes, could lift ten pounds, would not be able to work three days per week, and could not concentrate for two hours at a time could not sustain competitive employment.  R. at 463.

### G.  RELEVANT ASPECTS OF THE ALJ'S DECISION

The ALJ found that Dykes met the insured statute requirements of the Social Security Act through December 31, 2012.  R. at 415.  He also found that Dykes had not engaged in substantial gainful activity since the alleged onset date of February 1, 2010. *Id.*  Further, the ALJ found that Dykes had the following severe impairments: osteoarthritis of the knees, status-post left and right knee replacements, status-post right knee arthroscopy, degenerative disc disease of the lumbar spine, lumbar spondylosis, right shoulder rotator cuff tear status-post arthroscopy, sleep apnea, chronic obstructive pulmonary disease, restless leg syndrome, and depression.  *Id.*

The ALJ declined to consider Dykes' history of stroke and its residual effects as severe impairments because there was a lack of medical records supporting the severity of residual effects stemming from the strokes and because neither the testimony from Dr. Fischer nor Dr. Brooks supported finding any severe effects resulting from the same.  R. at 416.  The ALJ further declined to consider Dykes' history of cannabis use as a severe impairment because the medical evidence indicated that his cannabis dependence was in full remission.  R. at 416-417.

18

In addition, the ALJ concluded that Dykes did not have any impairment or combination of impairments that met or medically equaled the severity of the listed impairments in Appendix 1.  R. at 417.  To make this conclusion, the ALJ considered Dykes' physical impairments under Listing 14.09, Inflammatory Arthritis; Listing 1.04, Disorders of the Spine; Listing 1.02, Major Dysfunction of the Joint(s) (Due to Any Cause); Listing 3.10, Sleep-related Breathing Disorders; and Listing 3.02C, Chronic Pulmonary Insufficiency.  R. at 417-418.  The ALJ further noted that he evaluated Dykes' restless leg syndrome under the listed impairments but that no listing specific to restless leg syndrome existed and that the medical evidence did not provide any opinion that this condition medically equaled any of the listed impairments.  R. at 418.

The ALJ also considered Dykes' mental impairments under Listing 12.04, paragraphs B and C.  R. at 419-420.  Under paragraph B, he considered any restrictions on Dykes' daily living, which he found only mildly restricted; Dykes' social functioning, which he also found only mildly affected; and Dykes' concentration, persistence, or pace, which he found were moderately affected.  R. at 419.  There was no evidence of any episodes of decompensation.  *Id.*  The ALJ relied mainly upon the evidence provided by Dr. Brooks and Dr. McCoy to make these findings under paragraph B.  *Id.*  The ALJ found no evidence in the record to support a finding under the criteria in paragraph C.  R. at 419-420.

After considering the entire record, the ALJ determined that Dykes had the residual functional capacity to perform sedentary work, as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that he can only occasionally balance and stoop, but can never kneel, crouch, or crawl.  R. at 420.  The ALJ found that Dykes can occasionally reach

19

overhead with his right upper extremity, can frequently use his right upper extremity for all other manipulative activities, and can continuously use his left upper extremity for all manipulative activities.  *Id.*  The ALJ also found that Dykes can occasionally use foot controls but must avoid all unprotected heights.  *Id.*  With regard to his mental capabilities, the ALJ further found that Dykes can perform simple, repetitive, and unskilled tasks and has no limitations with social functioning.  *Id.*

In determining Dykes' residual functional capacity, the ALJ found that Dykes' testimony was not entirely credible and gave Dykes' testimony little weight because his testimony consisted of purely subjective allegations that were not consistent with the overall medical evidence.  R. at 421.  The ALJ, however, gave great weight to the opinion of Dr. Fischer because the totality of the medical evidence supported his opinion that Dykes could work at the indicated residual functional capacity.  R. at 422.  The ALJ further described examples in the medical record that demonstrated that Dykes' surgeries on his knees, shoulders, and back helped alleviate his pain to support giving Dr. Fischer's opinion great weight.  R. at 422-425.  The ALJ gave Dr. Singh's opinion and Dr. Neal's opinion, both of which actually indicated that Dykes was less restricted than Dr. Fischer had opined, some weight because they were consistent with the determination that Dykes' physical limitations did not totally preclude work activities.  R. at 426-427.  The ALJ gave the opinions of treating physicians Dr. Palmer and Dr. Minnich little weight because their opinions were not supported by the medical evidence as a whole.  R. at 427.  The ALJ explained that Dr. Palmer's and Dr. Minnich's opinions were not entitled to controlling or greater weight because (1) their opinions included conclusions reserved for the Commissioner; (2) their opinions were inconsistent with the medical evidence

confirming the effectiveness of Dykes' treatment to alleviate his complaints; (3) their opinions were based largely on Dykes' subjective statements, which the ALJ already explained were not entirely credible; and (4) the possibility exists that treating physicians may express an opinion to assist a patient out of sympathy or to avoid conflict.  R. at 427-428.

With regard to the medical evidence relating to Dykes' mental condition, the ALJ gave great weight to Dr. Brooks' opinion for the same reasons he provided for giving Dr. Fischer's opinion great weight.  R. at 428.  The ALJ found that the medical evidence garnered from Meridian Health Services was unconvincing because it related to extraneous factors, such as familial and financial issues, affecting Dykes' mental condition rather than relating his symptoms to any underlying mental impairment.  R. at 428-429.  The ALJ afforded Dr. McCoy's opinion no weight because Dr. McCoy noted that he suspected Dykes might have been malingering.  R. at 429.  The ALJ determined that Mr. Wilson's opinion from March 26, 2014, garnered little weight because (1) his opinion, which was based on Dykes' strokes, falls well outside his area of expertise, and (2) the medical evidence does not support finding that Dykes incurred the residual effects that Mr. Wilson describes as a result of Dykes' strokes.  R. at 430.  Mr. Wilson's November 6, 2014, opinion also received little weight because it directly conflicted with his opinion from March 26, 2014.  *Id.*  The ALJ further gave Ms. Hornsby's testimony little weight because, like Mr. Wilson's opinions, her testimony is not supported by the totality of the medical evidence.  R. at 430-431.  The ALJ noted that neither Mr. Wilson nor Ms. Hornsby could be considered an acceptable medical source that could establish the existence of

a medically determinable impairment or provide medical opinions, and that the evidence presented by Mr. Wilson and Ms. Hornsby was considered "other source" evidence.  *Id.*

The ALJ adopted the VE's opinion that Dykes could not perform his past relevant work.  R. at 431.  The ALJ further adopted the VE's opinion that a person with Dykes' residual functional capacity, age, education, and work experience could perform the following jobs, which were available in significant numbers in the national and local economy: Circuit Board Assembler, Information Clerk, and Surveillance System Monitor.  R. at 432-433.  Accordingly, the ALJ concluded that Dykes was not disabled.  R. at 433.

## II. STANDARD

To be eligible for DIB or SSI,[2] a claimant must have a disability under 42 U.S.C. § 423.   "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423 (d)(1)(A).  To determine whether or not a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

I.      If the claimant is employed in substantial gainful activity, the claimant is not disabled.

II.     If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

III.    If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1505 *et seq.*  The SSI regulations are substantially identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq.*  For convenience, only the DIB regulations are set forth herein.

IV.    If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

V.     If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, but then it shifts to the Commissioner at the fifth step. *See Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673; *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). "Substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Craft*, 539 F.3d at 673 (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Nelson*, 131 F.3d at 1234.

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). *See also*, *Craft*, 539 F.3d at 673. Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must

articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995).  *See also*, *Craft*, 539 F.3d at 673 (stating that not all evidence needs to be mentioned, but the ALJ "must provide an 'accurate and logical bridge' between the evidence and the conclusion" (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004))).  An ALJ's articulation of his analysis enables the Court to "assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review."  *Craft*, 539 F.3d at 673.

### III.  ANALYSIS

At the outset, the Court addresses the Commissioner's argument that Dykes' claims are waived because they are not sufficiently developed.  *See* Dkt. No. 24 at 13.  In his Brief, Dykes argued that (1) the ALJ failed to give proper weight to Dykes' treating and examining physicians' opinions and (2) the ALJ did not base Dykes' residual functional capacity on all of Dykes' impairments and therefore presented an improper hypothetical to the VE.  Dkt. No. 19 at 9-11.  Although Dykes does not present his arguments in great detail, his Brief sufficiently raised these arguments to narrowly avoid waiver in this instance.  *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013) (finding that an argument is waived when it is not raised before the district court).

Dykes asserts that the ALJ erred when he did not give his treating and examining physicians controlling weight.  Dkt. No. 19 at 9-10.  The Commissioner, however, argues that the ALJ is not required to give controlling weight to a treating physician and that the ALJ cited good reasons to discredit the opinions of Dykes' treating physicians.  Dkt. No. 24 at 14.

"A treating physician's opinion is entitled to controlling weight so long as it is supported by objective medical evidence and is consistent with other substantial evidence in the record." *Luster v. Astrue*, 358 Fed. Appx. 738, 740 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)).  An ALJ may reject a treating physician's opinion if there is no objective evidence or if substantial evidence of record contradicts the treating physician's opinion, but he "must articulate good reason for doing so." *Luster*, 358 Fed. Appx. at 740.  Indicating that the medical evidence does not support the treating physician's opinion is considered a "good reason" for an ALJ to discredit that treating physician's opinion.  20 C.F.R. § 404.1527(c)(3).  Furthermore, an ALJ is not required to give controlling weight to any opinion, including that of a treating physician, that makes a conclusion reserved for the Commissioner.  20 C.F.R. § 404.1527(d); *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010).

The Court agrees with the Commissioner that the ALJ provided sufficient reasoning to discredit the opinions of Dykes' treating physicians.  When explaining why he gave the opinions of Dr. Palmer and Dr. Minnich little weight, the ALJ reasoned that their opinions make conclusions reserved for the Commissioner and were inconsistent with the medical records that confirmed the effectiveness of Dykes' treatments.  R. at 427. The ALJ also explained in great detail how the medical evidence demonstrates that Dykes' surgeries to his knees, shoulder, and back helped alleviate his symptoms.  R. at 423-425.  Additionally, the ALJ reasoned that Dr. Palmer's and Dr. Minnich's opinions were based largely on Dykes' subjective statements, which the ALJ found were not entirely credible, and that the treating physicians may be expressing these opinions in

25

order to assist Dykes based on sympathy or to avoid conflict.  R. at 427-428.  Based on these justifications, it was reasonable for the ALJ to conclude that the treating physician opinions from Dr. Palmer and Dr. Minnich did not deserve controlling weight.

Dykes also argues that the ALJ failed to consider his impairments resulting from his strokes and depression to determine his residual functional capacity and, therefore, proposed an improper hypothetical to the VE using an invalid residual functional capacity.  Dkt. No. 19 at 11.  In response, the Commissioner asserts that the ALJ's residual functional capacity determination was supported by substantial evidence.  Dkt. No. 24 at 18-19.

The Court concludes that the ALJ reasonably based Dykes' residual functional capacity on substantial evidence.  The ALJ explained that the medical evidence did not demonstrate that Dykes had any residual effects stemming from his strokes.  R. at 416, 430.  The ALJ even noted that Dykes admitted that his symptoms had improved dramatically and that he denied having stoke-type symptoms upon direct questioning.  R. at 416.  Additionally, the ALJ stated that the opinions of medical experts, Dr. Fischer and Dr. Brooks, demonstrated that Dykes did not have any significant or vocationally relevant limitations as a result of his strokes.  *Id.*

The ALJ further reasoned that the medical evidence did not support finding that Dykes' depression limited his ability to work.  R. at 428-429.  The ALJ noted that the medical evidence from Meridian Health Services did not "relay the type of limitations that would preclude work.  …To the contrary, they suggest that it is [Dykes'] financial difficulties and desire to obtain disability benefits that are so great that they impact his everyday life, as opposed to an underlying mental impairment."  R. at 429.  The ALJ also

relied on Dr. Brooks' opinion, which found that Dykes' depression did not preclude work activities.  R. at 428.  Therefore, when determining Dykes' residual functional capacity, the ALJ reasonably found that neither the residual effects from Dykes' strokes nor Dykes' depression limited Dykes' ability to work.  Because the ALJ described a hypothetical person with Dykes' reasonable residual functional capacity to the VE, the ALJ presented the VE with an appropriate hypothetical on which the VE could render his opinion.

## IV.  CONCLUSION

For the reasons stated herein, the Court has concluded that Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, did not err in finding that Dykes was not disabled under Title II or XVI of the Social Security Act, 42 U.S.C. §§ 416, 423 & 1382(c). Therefore, this Court **AFFIRMS** the Commissioner's decision.  The Court will enter judgment accordingly.

IT IS SO ORDERED this 3d day of January, 2017.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Patrick H. Mulvany
patrick@mulvanylaw.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
Kathryn.olivier@usdoj.gov